UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
DANIELLE SUTTON,

                    Plaintiff,

                                          <u>MEMORANDUM & ORDER</u>
                                          18-CV-7434(JS)(ARL)

    -against-

STONY BROOK UNIVERSITY, NICOLE GALANTE
in her Individual and Official Capacities,
CHARLES TABER, in his Individual and
Official Capacities, SAMUEL L. STANLEY, JR.
in his Individual and Official Capacities,

                    Defendants.
----------------------------------------x
APPEARANCES
For Plaintiff:         Danielle Sutton, <u>pro se</u>
                  927 Montauk Highway
                  P.O. Box 113
                  Oakdale, New York 11769

For Defendants:       Richard H. Yorke, Esq.
                  Assistant Attorney General
                  New York State Attorney General's Office
                  200 Old Country Road, Suite 240
                  Mineola, New York 11501

SEYBERT, District Judge:

        <u>Pro se</u> plaintiff Danielle Sutton ("Sutton" or "Plaintiff") commenced this action against defendants Stony Brook University ("SBU"), Nicole Galante ("Galante"), Charles Taber ("Taber"), and Samuel L. Stanley, Jr. ("Stanley") (together, the "Defendants"). Plaintiff's Second Amended Complaint ("SAC," D.E. 36-1) alleges: (1) gender-based discrimination and retaliation claims pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, <u>et seq.</u>; (2) violations of the First Amendment

and Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983"); and (3) state law claims for breach of contract, negligence, negligent infliction of emotional distress, and breach of fiduciary duty.  Plaintiff seeks, among other things, an equitable order directing Defendants to vacate her dismissal from SBU, expunge any references to her dismissal in her record, and to reinstate Plaintiff and award her a degree.

Currently pending before the Court is Defendants' motion to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons set forth below, Defendants' motion is GRANTED with respect to Plaintiff's federal claims and Plaintiff is GRANTED leave to file a Third Amended Complaint consistent with this Memorandum & Order.

<u>BACKGROUND</u>

I.   <u>Factual Background</u>[1]

In August 2015, Plaintiff enrolled in the English Teacher Education Program at SBU.  (SAC ¶ 1.)  She earned an Advanced Graduate Certificate in Teaching Writing in May 2017, and Galante, the Acting Director of the English Teacher Education

---

[1] The following facts are drawn from the SAC and are assumed to be true for purposes of this Memorandum and Order.

Program, and Sharon Anthony ("Anthony"), the Director of Student Teaching, approved Plaintiff to student teach for the Fall 2017 semester.  (SAC ¶¶ 5, 6.)

On September 11, 2017, Plaintiff began student teaching at Sachem North High School.  (SAC ¶ 41.)  Thomas Mangano ("Mangano") was Plaintiff's student teaching supervisor and instructor at SBU.  (SAC ¶ 42.)  Prior to the start of the semester, on May 18, 2017, Plaintiff received a text message from Mangano inviting her and the four other students (two of whom were female) enrolled in his Fall seminar class to a breakfast meeting at a hotel restaurant.  (SAC ¶ 60.)  Plaintiff declined the invitation. (SAC ¶ 60.)  She alleges that Mangano emailed, texted and telephoned her several times during the summer to arrange another time to meet.  (SAC ¶¶ 61-68.)  Plaintiff claims that she felt uncomfortable receiving unwanted phone calls and text messages and perceived Mangano's persistence to meet for breakfast as harassment.  (SAC ¶ 69.)  Plaintiff believes that she was the only student that did not meet with Mangano over the summer.  (SAC ¶ 71.)

During Mangano's August 30, 2017 seminar class, he asked the class if anyone was opposed to Saturday morning breakfast meetings throughout the semester.  (SAC ¶ 72.)  Plaintiff alleges that she objected to the Saturday meetings and that Mangano "reprimanded" her for refusing to attend the meetings.  (SAC ¶¶

3

73-74.)  Plaintiff claims that Mangano kept her after class because he was "concern[ed]" that she was the only one in all of his years of being a supervisor who had refused to attend a breakfast meeting and said, "[y]ou keep putting me off.  I felt like you were brushing me off.  That's not how you treat your Supervisor."  (SAC ¶¶ 79-82.)  Plaintiff also alleges that Mangano told her that if breakfast was a problem, she could meet with him for lunch or coffee at Starbucks.  (SAC ¶ 86.)  She told Mangano that it was "inappropriate" and that she did not want to meet him off campus to which he allegedly responded, "[w]hen a professor extends himself to you and you don't take him up on the offer, it's hard to get past."  (SAC ¶¶ 86-87 (emphasis omitted).)  Plaintiff claims that Mangano had paid for numerous breakfast meetings at off-campus hotels with his students, though she never attended any of them.  (SAC ¶ 77.)

Plaintiff claims that after her refusal to meet with Mangano, "he became hostile towards [her.]"  (SAC ¶ 88.)  She alleges that Mangano would unexpectedly show up at the high school where she was student teaching to "check in on Plaintiff," and that he texted and phoned her multiple times, "concerned [that] she was not replying."  (SAC ¶¶ 89, 92, 95-97.)  She claims that on September 12, 2017, Mangano pulled her aside at the doorway to an empty classroom, and standing close to her, told her not to "spend so much time getting ready" while "staring at [her] up and

4

down."   (SAC ¶ 90.)   She claims that every time Mangano saw Plaintiff he made a point "to engage in a long lingering handshake" that "made Plaintiff feel uncomfortable."  (SAC ¶ 91.)  Plaintiff additionally claims that Mangano made "excuses to keep Plaintiff after class or force her to go to his office."  (SAC ¶ 103.)

On September 25, 2017, Plaintiff alleges that Mangano "bullied" her and made "demeaning" and "disparaging comments about her decision to become an English teacher in an effort to steer her to quit."  (SAC ¶ 106.)  She claims that he stated that she was "horrible," a "disaster," and that she should "give up teaching."  (SAC ¶¶ 107, 109.)  Plaintiff alleges that on the same date, Mangano made "gender based/gender bias comments" to Plaintiff, including that "Plaintiff 'pranced' around the room during her student teaching."  (SAC ¶ 108 (emphasis omitted).) Plaintiff claims that Mangano stated that "women looked nice in dresses" and that Mangano and Anthony had told students that "'ladies' wearing dresses and 'men' wearing suits were the only 'professional' attire."  (SAC ¶ 129.)  Plaintiff claims that she "wore slacks."  (SAC ¶ 129.)

She further alleges that after Mangano observed her September 29, 2017 class, he told her that her refusal to answer his phone calls and text messages was "a problem" and that "he had enough of Plaintiff's behavior towards him."  (SAC ¶¶ 124-26.)  At the same time, Plaintiff maintains that Mangano stated her

performance on September 29 would be enough to pass.  Nevertheless, she claims that on two prior occasions, August 30, 2017 and September 25, 2017, Mangano said that he could not write Plaintiff a letter of recommendation for a teaching job knowing her "attitude" towards his breakfast meetings.  (SAC ¶ 111.)  Plaintiff claims that during September 2017, Mangano told Plaintiff that she could be taken out of student teaching if he recommended it to Galante.  (SAC ¶ 127.)

Plaintiff alleges that on or about September 29, 2017, she complained via email to Galante about "Mangano's behavior and perceived harassment and requested female, Director of Student Teaching, Sharon Anthony as [her] Student Teaching Supervisor/Instructor."  (SAC ¶ 151, 155.)  She claims that Galante "did not report a harassment complaint to the Title IX officer or advise Plaintiff of her rights."  (SAC ¶ 153.)  She alleges that "Galante held a grudge against Plaintiff for speaking out against [Mangano's] [b]reakfasts and was concerned Plaintiff might muddy the reputation of her program."  (SAC ¶ 155.)

On October 9, 2017, Galante notified Plaintiff that she should no longer report to Mangano's seminar class and that she was now in Anthony's class.  (SAC ¶ 154.)  On October 11, 2017, Galante notified Plaintiff via email that October 13, 2017 would be her last day of student teaching.  (SAC ¶ 159.)  As of that

date, Plaintiff had completed twenty-four of the seventy-five days required for student teaching. (SAC ¶ 167.)

On October 12, 2017, Plaintiff's father emailed Ken Lindblom ("Lindblom"), Dean of the School of Professional Development, and requested his involvement. (SAC ¶ 163.) Lindblom's response was supportive of Galante's decision. (SAC ¶ 163.) On October 13, 2017, Plaintiff emailed Stanley, SBU President, regarding her removal from student teaching, and three days later she received a response stating that her concerns were being looked into and instructing her to communicate with Melissa Jordan ("Jordan"), Senior Assistant Dean and School of Professional Development Manager for Records and Admissions. (SAC ¶¶ 172-73, 226.)

Plaintiff claims that on or about October 16, 2017, Galante emailed Plaintiff a "Spring 2018 Student Teaching Contract" with an attachment and wrote, "[i]f you are permitted to continue student teaching, you will do so in the Spring[] 2018 semester. . . and you will do so after signing a contract. . . ." (SAC ¶ 174 (ellipses in original).) Galante instructed Plaintiff that she would be dismissed if she did not agree to sign the contract with attachment by October 24, 2017. (SAC ¶ 177.)

Plaintiff claims that SBU never held a hearing and never issued formal letter regarding her removal from student teaching; everything was done via email. (SAC ¶ 178.) On October 18, 2017,

Plaintiff went to Anthony's seminar class but was told to leave because she was not currently student teaching due to her failure to sign the student teaching contract.  (SAC ¶ 180.)  On October 19, 2017, Lindblom instructed Plaintiff:

> At this point, you have two choices: 1) agree to the program Dr. Galante has set out for you; or, 2) refuse to comply or ignore the agreement and be dismissed from the program. Please note that selecting number 1 does not guarantee you a new student teacher placement.

(SAC ¶ 182.)

On October 25, 2017, Taber, as Dean of the Graduate School and Vice Provost for Education, dismissed Plaintiff from the English Teacher Education Program by default for not meeting the program's "milestones" by an October 24, 2017 deadline.  (SAC ¶ 194, Ex. B, "Dismissal Letter" dated Oct. 25, 2017.)  According to Taber's dismissal letter, the program's "milestones" included "completing a deep reflection paper of [Plaintiff's] practice, professionalism, and commitment to the profession and to meet with Dr. Galante the week of December 11, 2017 to discuss [Plaintiff's] reflections."  (SAC, Ex. B.)  Additionally, the "milestones" required that Plaintiff sign the Spring 2018 student teaching contract.  (SAC, Ex. B.)  Plaintiff received the dismissal letter, sent by certified mail, on or about October 30, 2017.  (SAC ¶ 216.)  It directed Plaintiff to contact Jordan if she wanted to appeal her dismissal.  (SAC ¶ 226.)

On November 5, 2017, Plaintiff appealed her dismissal from the program.  (SAC ¶ 230.)  On November 13, 2017, Taber reversed Plaintiff's "withdrawal" pending a final determination by the University but informed Plaintiff that her dismissal from the program was still in effect and that she was therefore not able to attend classes.[2]  (SAC ¶ 238, Ex. C, letter dated Nov. 13, 2017.)  The Appeal Panel Committee met on November 27, 2017 and issued a decision denying Plaintiff's appeal on December 19, 2017.  (SAC ¶¶ 245, 246.)  Plaintiff alleges that she was never informed of an appeal hearing date and that she was not provided with witness statements.  (SAC ¶¶ 240-41.)  Plaintiff claims that she did not receive the appeal rejection letter until December 28, 2017.  (SAC ¶ 250.) On December 20, 2017, SBU's Registrar recorded withdrawals and updated Plaintiff's transcript to read: "[w]ithdrawn from University."  (SAC ¶ 252.)

According to Plaintiff, Taber's replacement as Vice Provost was announced on July 1, 2019 and Stanley resigned on or about July 31, 2019.  (SAC ¶¶ 31, 249.)

II.  Procedural History

Plaintiff filed her initial complaint on December 28, 2018 (D.E. 1) and simultaneously moved for a preliminary injunction (D.E. 2).  By Electronic Order dated February 12, 2019, this Court

---

[2] On October 25, 2017, SBU's Registrar issued withdrawals on Plaintiff's transcript and a hold on all services.  (SAC ¶ 212.)

denied Plaintiff's motion for preliminary injunction finding that she failed to show that "extreme or very serious" harm would result from the denial of her motion, and that Plaintiff failed to meet the burden of establishing "a clear likelihood of success on the merits." (Feb. 12, 2019 Elec. Order.)

Following Defendants' first motion to dismiss (D.E. 19), on April 10, 2019, Plaintiff sought leave to amend her complaint (D.E. 22), which this Court granted on April 15, 2019 (Apr. 15, 2019 Elec. Order). Following Defendants' second motion to dismiss (D.E. 33), on July 10, 2019, Plaintiff again moved for leave to file a second amended complaint (D.E. 36), which this Court granted on August 1, 2019 (Aug. 1, 2019 Elec. Order).

On September 23, 2019, Defendants filed their third motion to dismiss Plaintiff's SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (D.E. 44.) Plaintiff filed an opposition on October 22, 2019 (D.E. 46), and Defendants filed a reply on November 6, 2019 (D.E. 47).

<u>DISCUSSION</u>

I.   <u>Standards of Review</u>

A. <u>Federal Rule 12(b)(1)</u>

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a

motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions.  See Morrison v. Nat'l Australia Bank, Ltd., 547 F.3d 167, 170 (2d Cir. 2008).  The Court must accept as true the factual allegations contained in the complaint, but it will not draw argumentative inferences in favor of Plaintiff because subject matter jurisdiction must be shown affirmatively.  See id.; Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998); Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Makarova, 201 F.3d at 113.

    B. Federal Rule 12(b)(6)

        To withstand a motion to dismiss, a complaint must contain factual allegations that "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This plausibility standard is not a "probability requirement" and requires "more than a sheer possibility that a defendant has acted unlawfully."  Id. (internal quotation marks and citation omitted).  Although the Court must accept all allegations in the complaints as true, this tenet is "inapplicable to legal conclusions."  Id.  Thus, "[t]hreadbare recitals of the

11

elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). Ultimately, the Court's plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint," Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998), but this has been interpreted broadly to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily relies, and anything of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (observing that a document is "integral" if the complaint "relies heavily upon its terms and effect").

A complaint filed by a pro se litigant is to be construed liberally and "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007). Nevertheless, a pro se complaint must state a plausible claim for relief and comply with the minimal pleading standards set forth in Federal Rule of Civil Procedure 8. See, e.g., Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir. 2014).

## II.   Consideration of Extrinsic Documents

As an initial matter, Defendants ask this Court to consider several documents attached as exhibits to their motion to dismiss.   Defendants contend that the exhibits attached to the Declarations of Nicole Galante ("Galante Decl.," D.E. 44-2) and Melissa Jordan ("Jordan Decl.," D.E. 44-10) are incorporated by reference in the SAC or, alternatively, are integral to the SAC and therefore should be considered with the instant motion. (Defs.' Br., D.E. 44-1, at 5-6.)   Plaintiff objects and argues that they were "not relied on in drafting the complaint."   (See Pl.'s Opp., D.E. 46, at 2.)

It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited in what facts it can consider.   See, e.g., Vasquez v. City of New York, No. 10-CV-6277, 2012 WL 4377774, at *1 (S.D.N.Y. Sep. 24, 2012) ("[T]he [general] rule [is] that documents outside the pleadings cannot be considered in a 12(b)(6) motion.").   However, as discussed supra, in deciding a motion to dismiss a court is entitled to consider, inter alia, "documents attached to or incorporated in [the complaint]  by reference," "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference," and "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint".   Weiss v. Inc. Village of Sag Harbor, 762

13

F. Supp. 2d 560, 567 (E.D.N.Y. 2011); see Chambers, 282 F.3d at 153 (holding a document may be considered on a motion to dismiss where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint"); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir. 2010) (noting that because the plaintiff referred in the complaint to certain e-mails, "the [d]istrict [c]ourt could deem them incorporated in the complaint and therefore subject to consideration" on a 12(b)(6) motion); Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in complaint or on which plaintiff relied in drafting complaint).

In this case, the Declarations in support of Defendants' motion to dismiss include the following exhibits: (1) a printout of group text messages from Mangano to his student teaching seminar students (Galante Decl., Ex. 1, D.E. 44-3); (2) a September 29, 2017 email from Plaintiff to Galante with the subject, "Dr. Mangano's comments/attitude towards me" (Galante Decl., Ex. 2, D.E. 44-4); (3) an October 3, 2017 email from Galante to Plaintiff (Galante Decl., Ex. 3, D.E. 44-5); (4) an October 9, 2017 email from Galante to Plaintiff (Galante Decl., Ex. 4, D.E. 44-6); (5) an October 11, 2017 email from Galante to Plaintiff summarizing a meeting between them (Galante Decl., Ex. 5, D.E. 44-7); (6) an October 11, 2017 from Galante to Dawn DelSini ("DelSini"), Plaintiff's co-teacher at Sachem school (Galante Decl., Ex. 6,

14

D.E. 44-8); (7) an October 17, 2017 email from Galante to Plaintiff with two attachments, including a Spring 2018 "Student Teaching Contract" and a "Reflection Requirements" assignment (Galante Decl., Ex. 7, D.E. 44-9); (8) the October 25, 2017 dismissal letter from Taber to Plaintiff (Jordan Decl., Ex. 11, D.E. 44-11); (9) a November 13, 2017 letter from Taber to Plaintiff noting that Plaintiff's withdrawal was reversed pending her appeal (Jordan Decl., Ex. 2, D.E. 44-12); and (10) the December 19, 2017 appeal denial letter from Taber to Plaintiff including the attachment of the Graduate Council Appeals Committee's ("GCAC") Report (Jordan Decl., Ex. 3, D.E. 44-13).

Upon review of the Complaint and the proposed exhibits, the Court finds that all of the exhibits attached to the Galante Declaration and the Jordan Declaration are "attached to [the complaint] or incorporated in it by reference," " 'integral' to the complaint and relied upon in it," or that "[P]laintiff has knowledge or possession of the material and relied on it in framing the [SAC]." Weiss, 762 F. Supp. 2d at 567; (see, e.g., SAC ¶¶ 60, 151, 154-56, 159, 174, 176-77, 189-92, 194, 207, 209, 238, 246; SAC, Exs. B & C.) Accordingly, in considering the instant motion, the Court considers all of the exhibits attached to Defendants' moving papers.[3]

---

[3] The Court notes that the October 25, 2017 dismissal letter from Taber to Plaintiff, and the November 13, 2017 letter from Taber

III. <u>Title IX Claims</u>

Title IX prohibits gender discrimination, which includes sexual harassment, against students enrolled in federally supported educational programs. <u>Murray v. N.Y. Univ. College of Dentistry</u>, 57 F.3d 243, 248 (2d Cir. 1995). Title IX provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Courts evaluate claims brought under Title IX pursuant to the same standards as those developed to evaluate claims of employment-related gender discrimination brought under Title VII of the Civil Rights Act of 1964. <u>Murray</u>, 57 F.3d at 249. The Supreme Court has held that while Title IX creates liability for institutions and programs that receive federal funds, it does not "authoriz[e] suit[s] against school officials, teachers, and other individuals."[4] <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S. 246, 257 (2009).

---

to Plaintiff noting that Plaintiff's withdrawal was reversed pending her appeal, are attached to both the Defendants' motion and to Plaintiff's SAC. (<u>See</u> Jordan Decl., Exs. 1 & 2; SAC, Exs. B & C.)

[4] "Congress expressly abrogated the states' sovereign immunity for Title IX claims." <u>Vega v. State Univ. of N.Y. Bd. of</u>

As such, SBU is the only Defendant potentially subject to Title IX liability, and therefore, the Court evaluates Plaintiff's Title IX claims solely against SBU.

A. Gender-based Discrimination and Harassment

Defendants contend that Plaintiff's gender-based Title IX claim should be dismissed because her allegations are conclusory and because she fails to allege that she complained to SBU regarding gender-based harassment. (Defs.' Br. at 10-15.) Specifically, Defendants claim that any comments made by SBU officials about professional dress were not gender-based but "generalized opinions" and that Plaintiff alleges no facts that any criticism of Plaintiff was motivated by gender. (Defs.' Br. at 11.) Defendants further argue that Plaintiff's "subjective characterization of her supervisor's teaching criticism" does not allege "objectively severe or pervasive harassment." (Defs.' Br. at 14.) As discussed below, the Court agrees.

1.   Title IX Standards

Under Title IX, a plaintiff establishes a prima facie case of gender discrimination by showing: (1) that she was subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the discrimination was based on sex. Manolov v. Borough of Manhattan

Trustees, 67 F. Supp. 2d 324, 340 (S.D.N.Y. 1999) (citing 42 U.S.C. § 2000d-7(a)).

Cmty. Coll., 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013).  Further, a plaintiff can establish a hostile educational environment claim under Title IX if she demonstrates "that [s]he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of h[er] educational environment."  Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 89 (2d Cir. 2011) (citing Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003)). To establish a hostile educational environment-sexual harassment claim, a plaintiff must show not only that the educational environment was hostile or abusive, but actually constituted discrimination "because of sex."  See Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

       To survive a motion to dismiss, a Title IX plaintiff "must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of [ ] discriminatory intent."  Yusuf v. Vassar Coll., 35 F.3d 709, 713 (2d Cir. 1994) ("A plaintiff alleging . . . gender discrimination by a university must do more than recite conclusory assertions.").  Additionally, a Plaintiff must plausibly allege that "an official who . . . has authority to

address the alleged discrimination and to institute corrective measures on the [university's] behalf has actual knowledge of discrimination and fails adequately to respond." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998); Papelino, 633 F.3d at 89.

　　　2.　Application[5]

　　　Plaintiff's allegations of gender discrimination and harassment fail to state a claim for which relief may be granted pursuant to Title IX standards.

　　　Plaintiff fails to allege any facts from which gender-based discriminatory intent could be reasonably inferred. Instead, Plaintiff offers conclusory claims that "[t]he male Supervisor's behavior toward Plaintiff was gender based/biased-- he felt rebuffed a [f]emale had refused to '[b]reakfast'" with him. (SAC ¶ 264.) Plaintiff alleges that she was treated

---

[5] Plaintiff's opposition raises, for the first time, allegations of a quid pro quo claim. (Pl's. Opp. at 7.) However, a plaintiff "cannot amend [her] complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss." K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013). In any event, even if the Court considered Plaintiff's quid pro quo claim, that claim fails as she has not alleged any facts that she was subject to sexual advances by any SBU officials. See Papelino, 633 F.3d at 89 ("[A] quid pro quo sexual harassment claim under Title IX requires proof of three elements: (1) the rejection of sexual advances; (2) a tangible school-related (as opposed to employment) consequence; and (3) a causal connection between the two.").

differently by Mangano because she was the only student (male or female) that refused to attend any of his breakfast meetings, not because she was female.  (SAC ¶¶ 60, 71, 88)  She further claims that Mangano "reprimanded" her for refusing to attend the breakfasts.[6]  (SAC ¶ 74.)   Plaintiff also focuses on Mangano's criticism of her performance as a student teacher, claiming that "Mangano bullied [her] and made demeaning, denigrating, [and] disparaging comments about her decision to become an English [t]eacher in an effort to steer her to quit."  (SAC ¶ 106.) However, such general allegations of harassment or mistreatment do not demonstrate discriminatory intent.  See Drumm v. SUNY Geneseo Coll., 486 F. App'x. 912, 914 (2d Cir. 2012) ("[P]laintiff's allegations that her supervisor 'berated' her and made other harsh comments . . . amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination.").

        As Plaintiff's factual allegations are assumed true for purposes of this motion, Plaintiff's claim that she subjectively

---

[6] Plaintiff alleges that in August and September 2017, "Mangano told Plaintiff [that] there was 'no way' he could write Plaintiff a letter of recommendation for a future teaching job knowing her 'attitude' towards his [b]reakfasts."  (SAC ¶ 111.) However, a supervisor's failure to write a letter of recommendation falls short of the level of severity or pervasiveness required to support a hostile environment claim. See Watson v. Richmond Univ. Medical Ctr., 408 F. Supp. 3d 249, 266 n.7 (E.D.N.Y. 2019).

perceived the environment to be hostile is accepted on its face.[7]
The question is whether Plaintiff has sufficiently pled facts that,
if proven, establish that she "was required to endure an
environment that 'objectively' was severely and pervasively
hostile." Novio, 286 F. Supp. 3d at 577 (citing Gregory v. Daly,
243 F.3d 687, 693 (2d Cir. 2001)).   In determining whether
Plaintiff's educational environment was objectively hostile or
abusive, this Court must look to "the totality of the circumstances
rather [than] individual events in isolation." Papelino, 633 F.3d
at 91 (citing Daly, 243 F.3d at 693).  "Factors that a court might
consider in assessing the totality of the circumstances include:
(1) the frequency of the discriminatory conduct; (2) its severity;
(3) whether it is threatening and humiliating, or a mere offensive
utterance; and (4) whether it unreasonably interferes with the
victim's academic performance." Hauff v. State Univ. of N.Y., 425
F. Supp. 3d 116, 136 (E.D.N.Y. 2019) (quoting Patane v. Clark, 508
F.3d 106, 113 (2d Cir. 2007)).

        Plaintiff fails to allege facts showing that her
education environment at SBU was objectively hostile or abusive,
even when looking at the totality of the circumstances.  Here,
Plaintiff alleges that "[t]he male Supervisor formed his opinions

---

[7] It is also assumed true that SBU is an educational institution
receiving federal funding and subjected to Title IX.  See Novio
v. N.Y. Acad. of Art, 286 F. Supp. 3d 566, 576 (S.D.N.Y. 2017)
(citation omitted).

of Plaintiff based on gender including when he said Plaintiff
'pranced' around the room, 'ladies' looked nice in dresses and was
critical on how long it took Plaintiff to get dressed." (SAC ¶
273.)   However, these isolated comments are insufficient to
establish a prima facie case of gender discrimination.[8]   See
Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 225-26 (E.D.N.Y.
2014) (dismissing gender-based hostile work environment claim
based on supervisor's statements to plaintiff "that he could not
wear shorts" and that "dressing in cool temperature attire was a
women thing"); Shalom v. Hunter Coll. of City Univ. of N.Y., No.
13-CV-4667, 2014 WL 3955167, at *6 (S.D.N.Y. Aug. 13, 2014)
(finding plaintiff's subjective feelings of offense to the
defendant's statements that plaintiff's clothes were "sloppy" and
"women were all wearing pants instead of dresses" insufficient to
show that sex-neutral statements had a discriminatory motive),
aff'd, 645 F. App'x 60 (2d Cir. 2016); see also Oncale, 523 U.S.

---

[8] Notably, Plaintiff has made no allegations regarding how
Mangano treated other students.  Had she alleged that Mangano
made similar comments to other female students, or that he
treated male students differently than female students,
Plaintiff "might have provided a good faith basis" for her
complaint of gender discrimination, but she makes no such
allegation.  See Drumm, 486 F. App'x. at 914, n.3; Manolov, 952
F. Supp. 2d at 533 (dismissing gender discrimination claim where
though plaintiff alleged that professors "intentionally treated
all white males in an adverse manner," plaintiff "failed to
allege any facts suggesting that he or other white males were
treated differently than other students").

at 80 ("We have never held that . . . harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations."). In sum, because there are no allegations in the SAC plausibly connecting any action taken towards Plaintiff to her gender,[9] Plaintiff fails to plead a prima facie claim of gender-based discrimination or harassment.

Plaintiff's gender-based Title IX claim fails for the additional reason that she has not alleged that SBU had knowledge of gender discrimination as required by Title IX. See Wolff v. State Univ. of N.Y., 678 F. App'x 4, 6-7 (2d Cir. 2017) (to establish a Title IX claim, a plaintiff "must show that the institutional defendants had actual knowledge of the harassment and failed to respond" (citations omitted)); Novio, 286 F. Supp. 3d at 577 (dismissing hostile environment claim where plaintiff sufficiently pled facts that, if proven, established that she "was required to endure an environment that objectively was severely and pervasively hostile," because she had not pled sufficient facts demonstrating that defendant had actual knowledge of the harassing conduct against plaintiff).

---

[9] Plaintiff also alleges that "the University supported the explicitly gender[-]based sex stereotyping gender[-]specific definition of 'professional' dress for student teachers" which violates Title IX.  (SAC ¶ 272.)  However, the student teaching contract that Plaintiff refers to merely states: "I understand that I am expected to dress and otherwise behave in professionally appropriate ways."  (SAC, Ex. A.)  This gender-neutral statement fails to show discriminatory intent.

Here, Plaintiff alleges that she complained to Galante via email on September 29, 2017 "about Mangano's behavior and perceived harassment" and requested a new female supervisor. (SAC ¶ 151.) However, noticeably absent from Plaintiff's email is any suggestion of gender-based discrimination or harassment. (See Galante Decl., Ex. 2.) Rather, as discussed supra, Plaintiff's email to Galante complained about her supervisor generally -- how he was hard on her and did not think she would succeed as a teacher. (See Galante Decl., Ex. 2) ("He makes me feel bad about myself and my decision to pursue teaching. He makes me feel as if I don't deserve to be a teacher.") At most, Plaintiff's email to Galante asserts that Mangano was "bullying" her and not discriminating against her based on her gender. See Johnson v. City Univ. of N.Y., 48 F. Supp. 3d 572, 574 (S.D.N.Y. 2014) ("Bullying and harassment have no place in the workplace, but unless they are motivated by the victim's membership in a protected class, they do not provide the basis for an action under Title VII."); Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000) (holding plaintiff was not subjected to a hostile environment for purposes of Title VII because "[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.").

Without a showing that Plaintiff's complaint to SBU officials alleged gender-based discrimination, and "not merely

generic perceived teaching failures, [SBU] cannot be charged with notice of an alleged violation" of Title IX.  See Manolov, 952 F. Supp 2d at 533 (dismissing Title VI and Title IX claims where plaintiff's complaint to school officials contained no references to alleged gender or race discrimination but only addressed teaching failures).  Therefore, Plaintiff has failed to allege that she was subject to gender-based discrimination or harassment, or that SBU had knowledge of the alleged discrimination, and thus fails to state a Title IX discrimination claim.  Accordingly, Plaintiff's Title IX discrimination claim against SBU is DISMISSED without prejudice.

B. Retaliation Claim

Retaliation against individuals because they complain of sex discrimination is also a violation of Title IX.  See Papelino, 633 F.3d at 91.  Applying Title VII standards, a plaintiff states a Title IX claim of retaliation by alleging: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action."  Id. (citation omitted).  "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the [defendants] violated the law."  Treglia

25

v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (internal
quotation marks omitted) (applying anti-retaliation provision of
Americans with Disabilities Act, 42 U.S.C. § 12203(a)).

Plaintiff's SAC fails to state a Title IX retaliation
claim because, as discussed supra, she has not alleged facts
plausibly suggesting that she engaged in a protected activity under
Title IX.  Plaintiff's September 29, 2017 email to Galante
generally complained about Mangano's treatment of her and
contained no references to gender-based discrimination or sexual
harassment. (See Galante Decl., Ex. 2.)  She stated that Mangano
had a "personal beef" with her because she did not meet with him
for his student teaching breakfast during the summer and that he
"make[s] [her] feel bad about [herself], and make[s] [her] want to
cry.  That is bullying." (Galante Decl., Ex. 2.)  Such generalized
complaints are insufficient to state a retaliation claim.  See
Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d
Cir. 2011) (affirming dismissal of Title VII retaliation claim
where "any complaints [plaintiff] made were generalized and
therefore the [defendant] could not reasonably have understood
that she was complaining of conduct prohibited by Title VII"
(internal quotation marks omitted)); Sutter v. Dibello, No. 18-
CV-0817, 2019 WL 4195303, at *14 (E.D.N.Y. Aug. 12, 2019)
("[C]omplaints must be sufficiently specific to make clear that
the [plaintiff] is complaining about conduct prohibited by the

applicable discrimination statute.") R&R Adopted by, 2019 WL 4193431 (E.D.N.Y. Sept. 4, 2019).

Thus, as Plaintiff "has failed to adequately allege that she had a good faith, reasonable belief that she challenged conduct that constituted gender discrimination," she has failed to plead the first element of a prima face Title IX retaliation claim.[10] Drumm, 486 F. App'x at 914.  Consequently, Plaintiff's Title IX retaliation claim is DISMISSED without prejudice.

IV.  Section 1983 Claims and Eleventh Amendment Immunity

Plaintiff asserts Section 1983 claims based on Defendants' alleged deprivations of her First Amendment right and her rights to due process and equal protection under the Fourteenth Amendment.  Defendants contend, however, that this Court lacks subject matter jurisdiction over Plaintiff's Section 1983 claims

---

[10] Notably, the Court also finds that Plaintiff has not alleged the fourth element of a Title IX retaliation claim -- a causal connection between the protected activity and the adverse action.  As discussed infra, in Part V.A.2, Plaintiff's SAC fails to allege a causal connection between her email complaint to Galante and her dismissal from SBU's English Teacher Education program.  On the contrary, Plaintiff acknowledges that she had issues with getting to her student teaching on time and had two bad lessons.  (See Galante Decl., Ex. 2.)  Plaintiff's dismissal from SBU's Education program was because of her own lack of professionalism, excessive lateness, poor performance, and her failure to complete the reflection assignment and agree to the standards of professionalism outlined in the student teaching contract.  (See Jordan Decl., Ex. 3.)

against SBU and the Defendants in their official capacities. (Defs.' Br. at 7.)   The Court agrees.

A. Section 1983 Claims Against SBU

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison, 547 F.3d at 170 (citation omitted).[11]

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."   U.S. CONST. amend. XI.   As a result, a State is immune from suits in federal court brought by its own citizens.   Soloviev v. Goldstein,

---

[11] "Whether a state's sovereign immunity under the Eleventh Amendment presents a question of subject matter jurisdiction is an open question in the Supreme Court and the Second Circuit." De Figueroa v. New York, 403 F. Supp. 3d 133, 149, n.7 (E.D.N.Y. 2019) (first citing Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998) and then Carver v. Nassau Cty. Interim Fin. Auth., 730 F.3d 150, 156 (2d Cir. 2013) (leaving open "whether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense")).   In any event, the Court first addresses the sovereign immunity defenses raised by Defendants. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) ("[S]ubject-matter jurisdiction necessarily precedes a ruling on the merits.").

104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015) (citations omitted). This immunity extends to state agencies as well, see, e.g., Dube v. State Univ. of N.Y., 900 F.2d 587, 594 (2d Cir. 1990) ("For Eleventh Amendment purposes, SUNY 'is an integral part of the government of the State of New York and when it is sued the State is the real party.'"), including suits for damages and also from declaratory and equitable actions. See Cory v. White, 457 U.S. 85, 91 (1982). As such, Eleventh Amendment immunity requires dismissal of all of Plaintiff's Section 1983 claims against SBU. Accordingly, Plaintiff's Section 1983 claims against SBU are DISMISSED with prejudice.

B. Section 1983 Claims Against the Individual Defendants in their Official Capacities

Eleventh Amendment immunity also extends to suits against state officials in their official capacities. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citation and citations omitted)).

However, the Supreme Court has created an exception to the immunity of state officials. Pursuant to Ex parte Young, 209 U.S. 123 (1908), "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as

opposed to the state, in their official capacities provided that [her] complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'" In re Deposit Ins. Agency, 482 F.3d 612, 618 (2d Cir. 2007) (first quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002), then quoting In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 372 (2d Cir. 2005)).[12] The Ex parte Young exception "rests on the premise -- less delicately called a 'fiction' -- that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255 (2011) (internal citation omitted).

However, the Ex parte Young exception to sovereign immunity "only authorizes suits against officials with authority to provide the requested relief." Siani v. State Univ. of N.Y. at Farmingdale, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (citations omitted). Thus, for the exception to apply, a plaintiff must allege that "the defendant has responsibility for the alleged conduct and the ability to redress the alleged violations."

---

[12] Because the Ex parte Young exception applies only to injunctive relief, Ross v. State of N.Y., No. 15-CV-3286, 2016 WL 626561, at *4 n.3 (S.D.N.Y. Feb. 16, 2016), Plaintiff is precluded from seeking damages under Section 1983 against the individual Defendants in their official capacities.

Shollenberger v. N.Y. State Unified Court Sys., No. 18-CV-9736, 2019 WL 2717211, at *5 (S.D.N.Y. June 28, 2019) (citing CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs., 306 F.3d 87, 99 (2d Cir. 2002)).

Here, Plaintiff alleges that her withdrawal from SBU constitutes an ongoing violation of federal law. She seeks an equitable order directing Defendants to vacate her dismissal from SBU, expunge any references in her academic record to the dismissal, reinstate Plaintiff, and award her a degree. (SAC, Relief Requested, at pp. 37-38.) Plaintiff, however, does not allege that the individual Defendants have the responsibility or capacity to provide her with the prospective relief she seeks. In fact, as Plaintiff admits, both Defendants Taber and Stanley are no longer employed by SBU (see SAC ¶¶ 31, 249) and therefore have no capacity to reinstate Plaintiff or award her a degree. See Siani, 7 F. Supp. 3d at 317 (dismissing claims against individual defendants in their official capacities where four of the defendants were former employees of CUNY and therefore had no capacity to reinstate plaintiff); Sutter, 2019 WL 4195303, at *8 (Ex parte Young exception did not apply where individual defendant retired and would therefore be unable to provide the requested relief).

With regard to Defendant Galante, Plaintiff fails to allege that she is in a position to grant her the relief sought.

31

Instead, Plaintiff argues that "[t]his court can remedy the claims, enter an Order to readmit, and award a degree-diploma by estoppel." (Pl.'s Opp. at 2); see Soloviev, 104 F. Supp. 3d at 245 (finding that the plaintiff's claims against individual state officers in their official capacities did not fall under the Ex parte Young exception because plaintiffs failed to "allege[] that the [i]ndividual CUNY [d]efendants have the responsibility or capacity to provide him with the prospective relief he seeks, i.e. to reinstate him"). Thus, Plaintiff's Section 1983 claim against Galante in her official capacity does not fall under the Ex parte Young exception and is therefore barred by Eleventh Amendment immunity.

Accordingly, Plaintiff's Section 1983 claims against the individual Defendants in their official capacities are DISMISSED with prejudice for lack of subject matter jurisdiction.[13]

V.   **Section 1983 Claims Against the Individual Defendants in their Individual Capacities**

The parties do not dispute that the Eleventh Amendment "provides no immunity for state officials sued in their personal capacities." Dube, 900 F.2d at 595 (citing Farid v. Smith, 850

---

[13] Additionally, the Ex parte Young exception to the principle of sovereign immunity under the Eleventh Amendment is inapplicable to claims "against state officials on the basis of state law." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984). Accordingly, Plaintiff's state law claims against the individual Defendants in their official capacities are also barred by the Eleventh Amendment.

F.2d 917, 920-23 (2d Cir. 1988)).   Defendants, however, assert that Plaintiff's Section 1983 claims against Defendants in their individual capacities are barred by the doctrine of qualified immunity.  (Defs.' Br. at 9.)

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law.   See 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)).

As discussed infra, because the Court finds that Plaintiff fails to allege any constitutional claims, it need not determine whether or not the Defendants are entitled to invoke the defense of qualified immunity.  See Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ("When a defendant officer . . . invokes qualified immunity . . ., a court must first consider [whether] . . . the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violate[d] a constitutional right[.]   If the answer to this question is no, 'there is no necessity for further inquiries concerning qualified immunity.'" (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)); see also

Powell v. City of N.Y., No. 14-CV-9937, 2016 WL 4159897, at *11 (S.D.N.Y. July 14, 2016) ("There is no need to linger on the qualified immunity analysis in this case, since, [ ] no constitutional violation can be made out." (internal quotation marks and citation omitted)).  Accordingly, the Court does not reach the question of whether the individual Defendants are entitled to qualified immunity in the first instance.[14]

   A. First Amendment Retaliation Claim

        Plaintiff appears to allege that she was retaliated against for exercising her First Amendment right to free speech after she sent a September 29, 2017 email to Galante complaining about her supervisor's behavior.  (SAC ¶ 265.)  Specifically, she claims that Galante's response to her complaint resulted in a reflections assignment and a student teaching contract that contained a gender-based dress requirement.  (SAC ¶ 266.) Plaintiff contends that Galante drafted these documents in an effort to "quash [her] free speech to protect Mangano . . . and the program's reputation."  (SAC ¶ 265(a).)

---

[14] Additionally, Defendants contend that "Plaintiff alleges no facts supporting Defendant Stanley's personal involvement" as required to state a Section 1983 claim for individual liability. (Defs.' Br. at 9-10).  However, the Court does not address this issue for the reasons discussed above -- namely, because Plaintiff fails to allege any constitutional violations.

Defendants contend that Plaintiff "makes only conclusory allegations that she was dismissed in retaliation for speech." (Defs.' Br. at 19.)  They claim that Plaintiff was removed from student-teaching for her unprofessional behavior and for her failure to complete a reflection assignment and agree to the Department's professional standards, among other reasons. (Defs.' Br. at 19.)  The Court agrees.

1.   First Amendment Retaliation Legal Standard

"Although the First Amendment does not expressly refer to retaliation, a retaliation claim 'is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" Geagan v. City Univ. of N.Y., No. 09-CV-3271, 2011 WL 3370395, at *10 (S.D.N.Y. July 14, 2011) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)).  "To survive summary dismissal, a plaintiff asserting [a] First Amendment retaliation claim[ ] must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. SUNY Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 106–07 (2d Cir. 2001) (citations omitted).

2.   <u>Application</u>

The first two elements of a First Amendment retaliation claim are not in dispute so the Court assumes that Plaintiff has sufficiently alleged that she engaged in protected speech -- Plaintiff's email complaint to Galante -- and that she suffered an adverse action -- dismissal from the student-teaching program.

With regard to the "causal connection" element, to survive a 12(b)(6) motion, a plaintiff must allege facts "sufficient to support the inference that the speech played a substantial part in the adverse action," <u>Davis v. Goord</u>, 320 F.3d 346, 354 (2d Cir. 2003) (citation omitted), "that is to say, the adverse [ ] action would not have been taken absent the [plaintiff's] protected speech." <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999). Thus, "[r]egardless of any retaliatory motive, the plaintiff cannot prevail if a defendant can show he or she would have taken the same action even in the absence of the allegedly improper reason." <u>Holmes v. Poskanzer</u>, 342 F. App'x 651, 653 (2d Cir. 2009) (summary order) (citation omitted).

Here, Plaintiff fails to allege a causal connection between her September 29, 2017 email to Galante and her dismissal from SBU. In fact, Plaintiff's email to Galante acknowledges that she had issues getting to her student teaching position on time and that she had "2 bad lessons." (<u>See</u> Galante Decl., Ex. 2.) Further, as stated in the letter denying Plaintiff's appeal of her

36

dismissal, Defendants had non-retaliatory reasons for Plaintiff's dismissal from SBU, namely: Plaintiff's lack of professionalism and preparedness, excessive lateness, and her failure to complete the reflection assignment and refusal to agree to the standards of professionalism outlined in the student teaching contract. (Jordan Decl., Ex. 3); see Grossi v. City of N.Y., No. 08-CV-1083, 2009 WL 4456307, at *8 (E.D.N.Y. Nov. 30, 2009) (dismissing retaliation claim for lack of plausibility where plaintiffs' pleading indicated that there was an alternate, non-retaliatory motive for the defendant's conduct).

Though, as Plaintiff alleges, she was "removed from student teaching in close proximity to making her complaint," (SAC ¶ 265(b)), "[t]emporal proximity . . . is just one of several factors to consider in determining whether a causal connection exists." Geagan, 2011 WL 3370395, at *14 (rejecting argument that the temporal proximity between plaintiff's speech and the denial of her appeal raised inference of retaliation noting that "the relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances") (citing Caldarola v. Town of Smithtown, No. 09-CV-0272, 2010 WL 6442698, at *12 (E.D.N.Y. July 14, 2010)), R&R adopted by, 2011 WL 1336574 (E.D.N.Y. Apr. 4, 2011) (dismissing First Amendment retaliation claim where plaintiffs failed to allege facts showing

a causal connection between the exercise of their First Amendment rights and any retaliatory acts against them)).

Notably, Defendants did not outright dismiss Plaintiff from the program.  Galante met with Plaintiff on October 11, 2017 to discuss her issues with lateness and professionalism, and her poor evaluations from both Mangano and Plaintiff's co-teacher, DelSini.  (Galante Decl., Ex. 5.)  Additionally, Galante made a reasonable proposal, in the form of a reflection assignment and student teaching contract, that, if accepted, would have avoided Plaintiff's dismissal.  (SAC, Ex. A; Galante Decl., Ex. 7).  However, Plaintiff failed to accept SBU's proposal and was dismissed from SBU for failure to meet the Education program's requirements.[15]  See Garcia, 280 F.3d at 107 (upholding dismissal of First Amendment retaliation claim where student rejected university's reasonable, good-faith proposal).  Thus, as Plaintiff fails to allege a causal connection between her First Amendment

---

[15] To the extent that Plaintiff claims that Galante's Spring 2018 student teaching contract requiring "professional dress" violates her right to free speech under the First Amendment, (see SAC ¶ 266; Pl.'s Opp. at 8), that claim also fails.  "[A] person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech-like conduct entitled to First Amendment protection."  See Zalewska v. Cnty. of Sullivan, 316 F.3d 314, 320 (2d Cir. 2003) (citing Tinker v. Des Moines Sch. Dist., 393 U.S. 503, 507-08 (1969)) (finding a woman's clothing "does not constitute expressive conduct entitled to First Amendment protection.").

right to free speech and her dismissal from SBU, she has failed to state a First Amendment retaliation claim.

Accordingly, Plaintiff's First Amendment retaliation claim is DISMISSED without prejudice.

B. Fourteenth Amendment-Based Section 1983 Claims

Plaintiff alleges that the individual Defendants violated her right to equal protection and due process, both procedural and substantive, under the Fourteenth Amendment.  The Court addresses each of these in turn.

1.   Equal Protection Claim

A plaintiff may allege a claim for the violation of her right to equal protection under the Fourteenth Amendment based on sex discrimination because the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals."  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (citing Feingold v. New York, 366 F.3d 138, 159 & n.20 (2d Cir. 2004) (reasoning that Section 1983 equal protection claims parallel Title VII claims)).  This principle also applies to Title IX claims.  See Weser v. Glen,

190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002) ("intentional discrimination proscribed by Title IX is discrimination that violates the Equal Protection Clause"), aff'd, 41 F. App'x 521 (2d Cir. 2002).

The Court finds that Plaintiff's equal protection claim against Defendants must also be dismissed because it is based on the same set of facts at issue in her Title IX discrimination claim and, as discussed, Plaintiff has not plausibly alleged facts suggesting that Defendants' conduct was specifically based on her gender. (See supra Part III); see also Wolff v. State Univ. of N.Y. Coll. at Cortland, No. 13-CV-1397, 2016 WL 9022503, at *23 (N.D.N.Y. Feb. 5, 2016) (finding that plaintiff's equal protection claim failed for the same reason as his Title IX claim), aff'd, 678 F. App'x 4 (2d Cir. 2017); R.S. v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 371 F. App'x 231, 234 (2d Cir. 2010) (observing that where a plaintiff alleges parallel Title IX and equal protection claims, they may fail for the same reason). Accordingly, Plaintiff's equal protection claim is DISMISSED without prejudice.

2.  Procedural Due Process

Plaintiff alleges that the individually-named Defendants violated her procedural due process rights when she was "arbitrarily [and] capriciously yanked out of [s]tudent [t]eaching" without a hearing. (SAC ¶ 282.) She claims that she

was "arbitrarily expelled without [d]ue [p]rocess for not signing an unlawful contract" (SAC ¶ 284), and that her dismissal was "non-academic." (Pl.'s Opp. at 1, 5, 7.) Defendants respond that Plaintiff's dismissal was based on academic decisions and that she was provided more process than is constitutionally required for an academic dismissal. (Defs.' Br. at 20-23.) The Court agrees.

      a.  <u>Academic Dismissal vs. Disciplinary Dismissal</u>

      The process to which Plaintiff was entitled depends on whether Plaintiff's dismissal from SBU was disciplinary or academic in nature. "While the line between academic and disciplinary decisions is not always clear, courts have considered a dismissal to be 'academic' where the rationale has to do with the student's deficiency in the skills necessary in school or in the career for which the school is training him, including lack of professionalism." <u>Wolff</u>, 2016 WL 9022503, at *17 (citing <u>Bd. of Curators of the Univ. of Mo. v. Horowitz</u>, 435 U.S. 78, 90, (1978) (holding that medical resident's dismissal was academic decision because it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal")).

      "On the other hand, disciplinary dismissals are typically those involving 'the violation by a student of valid rules of conduct.'" <u>Id.</u> at *18 (citing <u>Horowitz</u>, 435 U.S. at 86-

90). "Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians, will bear a 'resemblance to traditional judicial and administrative factfinding[.]'" Id. (quoting Fenje v. Feld, 398 F.3d 620, 625 (7th Cir. 2005)) (quotations omitted).

In the instant case, the Court finds that Plaintiff's dismissal was academic in nature. Plaintiff's October 25, 2017 dismissal letter states that she was dismissed from the English Teacher Education Program because she "failed to agree to the milestones established by [Defendants'] program by the deadline," including her failure to complete a reflection paper and to sign a Spring 2018 student teaching contract -- both of which were academic requirements -- in order for Plaintiff to continue her work in the program. (SAC, Ex. B.) Additionally, an October 11, 2017 email summarizing a meeting between Plaintiff and Galante demonstrates that Plaintiff's dismissal related to issues with her preparedness, lateness, professionalism, and performance reviews with regard to her student teaching. (Galante Decl., Ex. 5). Indeed, other courts have similarly determined that dismissals were academic in nature where they were based on professionalism concerns. See, e.g., Wolff, 2016 WL 9022503, at *18 (upholding dismissal of student as academic due to faculty concerns about his professionalism and suitability to be a teacher). Plaintiff does not allege any facts demonstrating that her dismissal was for

disciplinary reasons -- she does not claim that Defendants cited her for violating any rules of student conduct or that she was accused of cheating. See Horowitz, 435 U.S. at 86; Papelino, 633 F.3d at 95. Therefore, the Court finds that Plaintiff's dismissal was wholly academic.

> b.    Procedural Due Process Application

Plaintiff alleges that she was denied an initial hearing and the right to submit documents, testify, and call witnesses. (SAC ¶¶ 290, 302.)  She claims that "the dismissal letter was vague, non[-]specific and unclear as to the type of dismissal." (SAC ¶ 291(d).)  Plaintiff further alleges that she was denied the right to "appeal to all the necessary parties before being 'dismissed,'" and that she was "denied Notice of the Appeal Panel hearing."  (SAC ¶¶ 224, 286.)[16]

---

[16] Plaintiff additionally contends that SBU failed to follow its own policies.  (SAC ¶¶ 204, 205, 237, 285.)  However, "alleged deviations [from a university's grievance policy and procedure] that do not affect the fundamental fairness of a hearing do not rise to constitutional proportions." Barsoumian v. Williams, 29 F. Supp. 3d 303, 314 (W.D.N.Y. 2014) (citing Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972); see Brown v. Western Connecticut State Univ., 204 F. Supp. 2d 355, 366 (D. Conn. 2002) (alleged failure to tape record appeal hearing in violation of Student Handbook did not rise to level of constitutionally deficient process); Turof v. Kibbee, 527 F. Supp. 880, 885 (E.D.N.Y. 1981) (failure to afford informal pre-hearing conference required by college bylaws did not affect fundamental fairness of process where plaintiff nonetheless received a full hearing on the allegations against him)). Therefore, Plaintiff's allegations that SBU failed to follow its own policies and procedures, without more, are insufficient to state a due process violation.

"To state a Fourteenth Amendment procedural due process claim, Plaintiff must allege that (1) [SBU] officials . . . deprived [Plaintiff] of either a 'liberty' or 'property' interest, Horowitz, 435 U.S. at 82, and (2) the state's process was 'constitutionally [in]adequate.'" Marino v. City Univ. of N.Y., 18 F. Supp. 3d 320, 337 (E.D.N.Y. 2014) (quoting Zinermon v. Burch, 494 U.S. 113, 126 (1990)). There is no question that Plaintiff possesses a constitutionally cognizable property interest in the continuation of her academic studies. See Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991); Marino, 18 F. Supp. 3d at 337 (finding that Plaintiff had a "liberty" or "property" interest in her dealings with her state-run college based upon New York implied contract law). However, Plaintiff fails to allege that the process afforded to her by SBU officials was constitutionally inadequate.

"To satisfy procedural due process, an institution must give a student subject to possible dismissal for academic reasons notice and must render an ultimate decision that is 'careful and deliberate.'" Wolff, 679 F. App'x at 6 (quoting Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 191 (2d Cir. 2015)). "This standard reflects the need for 'far less stringent procedural requirements,' than those called for in [a] disciplinary dismissal." Dean, 804 F.3d at 192 (quoting Horowitz, 435 U.S. at 86) (finding that academic challenges require less formalized procedures than disciplinary determinations); cf. Goss

v. Lopez, 419 U.S. 565, 581 (1975) (holding that in disciplinary proceedings a student must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story").

Moreover, in academic dismissals, a court "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225, (1985). "The deference given to academic institutions is amplified at the highest levels of education as the 'instruction becomes both more individualized and more specialized.'" Marino, 18 F. Supp. 3d at 337-38 (quoting Horowitz, 435 U.S. at 90). Thus, "[c]ourts do not intrude on the authority of colleges to dismiss students for purely academic reasons." Murray v. N.Y. Univ. Coll. of Dentistry, No. 93-CV-8771, 1994 WL 533411, at *4 (S.D.N.Y. Sept. 29, 1994) (citation omitted).

In light of these standards, the Court finds that Plaintiff fails to allege that SBU and its officials offered constitutionally inadequate procedures. There is no question that SBU met both the notice and careful decision requirements in this case. Galante's October 11, 2017 email reiterates SBU officials'

concerns regarding Plaintiff's professionalism and clarified that Plaintiff's continuance in the program was at Galante's discretion. (See Galante Decl., Ex. 5; SAC ¶ 189.) Additionally, as discussed supra, Galante offered Plaintiff an opportunity to continue her placement in the program. (SAC ¶ 208; Galante Decl., Ex. 7.) However, as evidenced by her dismissal letter, Plaintiff was dismissed from the program after she failed to complete the reflection assignment and after she refused to sign the student teaching contract by the October 24, 2017 deadline. (SAC, Ex. B) (emphasis added). Though not required by due process standards, Plaintiff was even afforded the opportunity to appeal the dismissal, which she did on November 5, 2017. (SAC ¶ 230.)

None of Plaintiff's allegations involve requirements of procedural due process for academic dismissals. It is well-established that "a student facing academic dismissal is not entitled to a hearing or to cross-examine witnesses." McCann v. Univ. at Buffalo, No. 13-CV-0381, 2016 U.S. Dist. LEXIS 76829, *38 (W.D.N.Y. June 10, 2016) (citing Goss, 419 U.S. at 584); Horowitz, 435 U.S. at 86 n.3 ("a hearing is not required by the Due Process Clause of the Fourteenth Amendment"). Further, the Second Circuit has made clear that there is no constitutional right to review or appeal school disciplinary decisions. See Dean, 804 F.3d at 193; Patrick v. Success Acad. Charter Sch., Inc., 354 F. Supp. 3d 185, 205 (E.D.N.Y. 2018) ("Plaintiffs' claim 'runs counter to precedent

holding that those subject to school discipline do not enjoy a due process right to any appellate review.'" (citation omitted) (emphasis in original)) (collecting cases).   On the contrary, Plaintiff's allegations demonstrate that she was provided with more process than that which was due.   See Chandrapaul v. City Univ. of N.Y., No. 14-CV-0790, 2016 WL 1611468, at *25 (E.D.N.Y. April 20, 2016) ("Courts may not intervene to require colleges 'to confer diplomas on those who have been deemed to be unqualified.'" (citing Rosenthal v. N.Y. Univ., 482 F. App'x 609, 611 (2d Cir. 2012))).   Therefore, Plaintiff fails to state a procedural due process claim and it is DISMISSED without prejudice.

### 3.   Substantive Due Process

Plaintiff contends that Defendants violated her right to substantive due process when she was denied her property interest to continuous enrollment (SAC ¶ 299) and her liberty interest to pursue her career of choice (SAC ¶ 288).

"To state a substantive due process claim, a plaintiff must establish that a fundamental liberty or property interest 'was infringed in an arbitrary or irrational manner that shocks the conscience.'"   Nguyen v. Milliken, No. 15-CV-0587, 2015 WL 4925884, at *5 (E.D.N.Y. Aug. 18, 2015) (quoting Marino, 18 F. Supp. 3d at 338).   The Second Circuit has observed that "[t]he right to public education is not fundamental" and "there is no substantive due process right to public education."   Bryant v.

N.Y. State Educ. Dep't, 692 F.3d 202, 217-18 (2d Cir. 2012) (citing Handberry v. Thompson, 446 F.3d 335, 352-53 (2d Cir. 2006)); Marino, 18 F. Supp. 3d at 339 ("[T]he property right granted to plaintiff as a public school student under New York law is a sufficient interest for a procedural [d]ue [p]rocess claim, but does not hold weight as a fundamental right under the Fourteenth Amendment.")  Accordingly, Plaintiff's substantive due process claim based on a property interest in continuous enrollment is without merit.

On the other hand, courts have recognized a substantive due process right to pursue a chosen career under certain circumstances.  "While a person's right to pursue the profession of h[er] choice is recognized as a constitutionally protected liberty interest, courts in the Second Circuit have consistently held one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest." Marino, 18 F. Supp. 3d at 339 (quoting Toussie v. Cnty. of Suffolk, 806 F. Supp. 2d 558, 579-80 (E.D.N.Y. 2011) (citations omitted)); see also Schultz v. Inc. Vill. of Bellport, No. 08-CV-0930, 2010 WL 3924751, at *7 (E.D.N.Y. Sept. 30, 2010) (holding a "substantive due process claim based on infringement of [right to pursue chosen occupation] will succeed only where a person is blocked from participating in a particular field" (citation omitted)).

Here, Defendants did not deny Plaintiff an opportunity to practice in her chosen profession. In fact, after Plaintiff's removal from student teaching, Galante informed her that she would receive credit for the 24 hours of student teaching that she completed. (Galante Decl., Ex. 5.) Additionally, as discussed supra, Plaintiff was afforded the opportunity to work on her performance issues and to execute a student teaching contract that would have enabled her to student teach the following semester. However, Plaintiff declined the opportunity. Thus, as alleged, she was not precluded from engaging in her chosen profession.

Therefore, Plaintiff fails to state a substantive due process claim and it is DISMISSED without prejudice.[17]

## VI.   State Law Claims

In addition to the federal claims, Plaintiff asserts state law claims for breach of contract, negligence, negligent

---

[17] Even if the Court accepted Plaintiff's argument that her dismissal was disciplinary and not academic, her due process claims are still subject to dismissal. "As the Second Circuit has emphasized, '[t]his court has held on numerous occasions that where, as here, a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, an Article 78 proceeding is a perfectly adequate postdeprivation remedy.'" Attallah v. N.Y. Coll. of Osteopathic Med., 94 F. Supp. 3d 448, 457 (E.D.N.Y. 2015) (citing Grillo v. N.Y.C. Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002)). "Moreover, the fact that any such proceeding may now be untimely does not alter the Court's analysis." Id. at 458 n.10 (citing Campo v. N.Y.C. Emps.' Ret. Sys., 843 F.2d 96, 102 n.6 (2d Cir. 1988)).

infliction of emotional distress, and breach of fiduciary duty. However, because the Court has dismissed Plaintiff's federal claims, there is no longer a basis for federal jurisdiction over the state law claims. Under Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), a federal court should generally decline to exercise supplemental jurisdiction over state law claims if, as is the case here, the complaint's federal claims are dismissed in the litigation's early stages and there is no diversity jurisdiction.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and they are DISMISSED without prejudice to being refiled in state court.

## VII. Leave to Amend

The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir. 1999); see also FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). In addition, leave to replead should be liberally granted to pro se litigants. Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010).

While the Court is mindful that Plaintiff has already been granted two opportunities to amend the Complaint, (see Apr. 15, 2019 Elec. Order; Aug. 1, 2019 Elec. Order), Plaintiff is GRANTED LEAVE TO AMEND her SAC in accordance with this Memorandum and Order. Any Amended Complaint shall be filed within thirty

(30) days from the date of this Memorandum and Order and shall be titled "Third Amended Complaint" and shall bear the same docket number as this Memorandum and Order, 18-CV-7434(JS)(ARL). Plaintiff is cautioned that her failure to timely file a Third Amended Complaint will lead to the dismissal of her SAC with prejudice and the closure of this case.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiff's Title IX claims against SBU are DISMISSED WITHOUT PREJUDICE. Plaintiff's Section 1983 claims against SBU and Defendants in their official capacities are DISMISSED WITH PREJUDICE, and Plaintiff's Section 1983 claims against the individual Defendants are DISMISSED WITHOUT PREJUDICE. Additionally, at this time, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are DISMISSED WITHOUT PREJUDICE, and may be refiled in state court.

Plaintiff is GRANTED leave to file a Third Amended Complaint in accordance with this Memorandum and Order. Any Third Amended Complaint shall be filed within thirty (30) days from the date of this Memorandum and Order and shall be titled "Third Amended Complaint" and shall bear the same docket number as this Memorandum and Order, 18-CV-7434(JS)(ARL). Plaintiff is cautioned that a failure to timely file a Third Amended Complaint will result

in the dismissal of this action with prejudice and judgment will enter.

The Clerk of the Court is directed to mail a copy of this Order to the pro se Plaintiff.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   November __4__, 2020
         Central Islip, New York

52